**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                          :
PAUL FANELLI,                                    :        CIVIL ACTION
                                                          :
                         Plaintiff,              :
                                                          :
            v.                                   :        No.  15-240
                                                          :
LANSDALE BOROUGH, et al.,                        :
                                                          :
                         Defendants.             :
_____:

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                          **DECEMBER 15, 2016**

     Presently before the Court is Defendants, Lansdale Borough ("Lansdale"), Officer David

Gori ("Officer Gori"), Officer James Owens ("Officer Owens"), and Officer Richard

McCarrick's ("Officer McCarrick") (collectively "Defendants") Motion for Partial Summary

Judgment and Memorandum of Law in Support thereof pursuant to Federal Rule of Civil

Procedure 56, Plaintiff, Paul Fanelli's ("Plaintiff") Response in Opposition thereto, and

Defendants' Reply.  For the reasons set forth below, Defendants' Motion is granted in part and

denied in part.

## I.      BACKGROUND

     This case revolves around an incident where officers were called to Plaintiff's daughter's

house due to a disturbance.  Subsequently, Plaintiff filed a lawsuit pursuant to 42 U.S.C. § 1983

alleging claims for excessive force (Count I) against Officers McCarrick and Owens, bystander

liability (Count II) against Officers McCarrick and Owens, conspiracy (Count III) against

Officers McCarrick, Owens, and Gori, supervisor liability (Count IV) against Officer Owens,

and a <u>Monell</u>[1] claim (Count V) against Lansdale.  (<u>See</u> Am. Compl.)  Defendants have moved for Summary Judgment as to all claims except Plaintiff's excessive force claim against Officer Gori.

The pertinent facts of this case begin on January 20, 2013, at approximately 3:00 p.m., when Plaintiff went to his daughter's, Laura Fanelli ("Ms. Fanelli"), house located at 808 Walnut St., Lansdale, Pa, to drop off some paper products and food because Ms. Fanelli was going to have surgery the following day.  (Paul Fanelli Dep. 1/11/16, p. 127:11-24; Laura Fanelli Dep. 10/27/15 p. 21:10-24; Pl.'s Mot. in Opp. of Summ. J. Ex. G, Incident Rept. at 3 "Incident Rept.")  Plaintiff had discussed coming over to Ms. Fanelli's house the day before, but he had failed to check his emails that would have alerted him that she had changed her mind about allowing him to visit.  (Paul Fanelli Dep. 1/11/16, pp. 124:20-125:8.)  Ms. Fanelli has, on occasion, been required to call the police regarding Plaintiff's presence on her property.  (Laura Fanelli Dep. 10/27/15, p. 33:7-12.)  When Plaintiff arrived at Ms. Fanelli's home on January 20, 2013, the glass storm door was closed, but the inner solid door was open.  (Paul Fanelli Dep. 1/11/16, pp. 127:24 -128:2.)  Plaintiff knocked and no one answered, but he could see into the house through the glass door and saw Ms. Fanelli's boyfriend, Mike Tiziana ("Mike"), who was in the back bedroom with two other men, and Mike's father, Anthony, who was sitting on the sofa in the living room.  (<u>Id.</u> at p. 128:2-7.)

Mike then exited the house carrying a piece of furniture with his two friends.  (<u>Id.</u> at p. 128:19-21.)  After asking Mike's permission, Plaintiff then entered the home placing the food in the kitchen and sitting on the sofa near Mike's father.  (<u>Id.</u> at pp. 128:21-130:7.)  When Plaintiff initially entered the residence, Ms. Fanelli was in the bathroom; however, Mike alerted her to

---

[1] <u>Monell</u> refers to the seminal United States Supreme Court case addressing municipality liability.  <u>See</u> <u>Monell v. Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978).

Plaintiff's presence and she came out a few minutes later.  (<u>Id.</u> at p. 130:5-7.)  Upon seeing Plaintiff, Ms. Fanelli quipped, "who invited you here?"  (<u>Id.</u> at p. 131:21-24.)  Ms. Fanelli became "agitated" and "angry" at Plaintiff's presence and asked him to leave.  (Laura Fanelli Dep. 10/27/15, p. 22:4-7.)

It was at this point that Ms. Fanelli's boyfriend, Mike, became involved.  (Paul Fanelli Dep. 1/11/16, p. 133.)  An argument ensued between Plaintiff and Mike, and Ms. Fanelli called 9-11 informing them that Plaintiff would not leave her house and was picking a fight with Mike.  (<u>Id.</u> at pp. 133-38; Laura Fanelli Dep. 10/27/15, pp. 22:24-23:4.)  Plaintiff heard Ms. Fanelli call 9-11 and went outside and sat on the steps of the walkway leading to the home to wait for the police to arrive.  (Laura Fanelli Dep. 10/27/15, p. 23:6-11.)  The police arrived approximately five minutes later.  (<u>Id.</u> at 23:17.)

Officer McCarrick was the first to arrive and observed Plaintiff on the steps of the house appearing agitated.  (Incident Rept. at 3.; Richard McCarrick Dep. 1/19/2016, pp. 11:24-12:8; 17:19-18:1; 19:17-20:5.)  Officer McCarrick "very calmly" asked Plaintiff, "what happened here?"  (Paul Fanelli Dep. 1/11/16, p. 151:5-11.)  Plaintiff replied that he thought it "was twenty something's drama," and he did not think the police were necessary.  (<u>Id.</u> at p. 152:5-6.)  When Officer Gori arrived, Officer McCarrick entered Ms. Fanelli's home to discuss the incident with her.  (Incident Rept. at 3.; Richard McCarrick Dep. 1/19/2016, pp. 21:11-22:16.)

From this point forward, the parties' accounts of what took place differ greatly.  To avoid confusion, we will outline Plaintiff's and Defendants' version separately below.  It is worth noting at the outset that shortly before this incident, on October 5, 2013, Plaintiff had spinal fusion surgery in his upper back/neck at the C5-C6 vertebrae.  (Paul Fanelli Dep. 1/11/16, p. 60:20-22.)

**A.  Plaintiff's Version of the Events**

Plaintiff avers that when Officer Gori arrived, he took position to the left of the sidewalk at the entrance of the walkway that lead to Ms. Fanelli's home.  (Paul Fanelli Dep. 1/11/16, p. 152:19-24.)  Soon after, Officer Owens arrived and took position to the right of the sidewalk at the entrance of the walkway.  (Id. at p. 154:16-23.)  While all of this was happening, Ms. Fanelli was explaining to Officer McCarrick that she did not want Plaintiff arrested; rather, she simply wanted him removed from the premises.  (Laura Fanelli Dep. 10/27/15, pp. 24:4-5; 30:14-17.)  As Plaintiff was sitting and facing the street with Officer Gori to his left and Officer Owens to his right, he alleges that neither Officer made any effort to communicate with him.  (Paul Fanelli Dep. 1/11/16, pp. 154:24-155:5.)  Plaintiff  became curious about what was going on in the house, so he stood up, took his hands out of his pockets, and started walking towards the sidewalk (or the road).  (Id. at p. 155:6-10.)  In response, Officer Gori barked out at him, "where do you think you're going."  (Id. at p. 156:6-7.)  Plaintiff replied that he "wanted to see what's going on inside the house."  (Id. at p. 156:8-9.)  Officer Gori then informed Plaintiff that he was not "going anywhere."  (Id. at p. 157:13-14.)  At this time, Plaintiff was facing the house and proceeded to place his hands back in his coat pockets.  (Id. at p. 157:16-22.)

Plaintiff avers that Officer Gori requested that he take his hands out of his coat pockets, and he immediately complied.  (Id. at p. 158:5-14.)  Within ten seconds of Plaintiff removing his hands from his jacket, Plaintiff testified that, due to a habit, he placed his thumbs in his pants pockets leaving is fingers exposed.  (Id. at pp. 165:23-166:5.)  Plaintiff testified that Officer Gori then immediately grabbed his arm and began chicken winging him.[2]  (Id. at p. 166:8-10.)  Plaintiff stated that Officer Gori said, "I thought I told you to take your hands out of your

---

[2] Plaintiff uses the term "chicken wing" to refer to the act of grabbing his arm and placing it behind his back and then pushing it up towards his shoulder blade.  (Paul Fanelli Dep. 1/11/16, pp. 170:17-171:16.)

pockets." (Id. at p. 166:10-12.)  Plaintiff testified that at no time prior to Officer Gori grabbing

his arm and chicken winging him, did he resist or receive any verbal command from Officer

Gori.  (Id. at p. 170:8-24.)

The chicken winging caused Plaintiff to cry out in pain.  (Laura Fanelli Dep. 10/27/15, p.

24:21-24; Michael Tiziana Dep. 1/12/16, p. 27:16-17.)  Plaintiff also avers these cries of pain

prompted Officer McCarrick to leave the house and join Officers Gori and Owens outside.  (Pl.'s

Mot. in Opp. of Summ. J. at 6.)  Ms. Fanelli testified that Plaintiff was complying with the

Defendants' orders.  (Laura Fanelli Dep. 10/27/15, p. 40:4-6.)  Ms. Fanelli also testified that she

alerted Defendants to Plaintiff's recent neck surgery.  (Id. at pp. 28:21-29:3.)  Ms. Fanelli's

boyfriend, Mike, also testified that Plaintiff appeared in pain and had alerted Defendants to his

neck surgery.  (Michael Tiziana Dep. 1/12/16, p. 28:2-5.)

Plaintiff avers that Officer Owens used excessive force after the initial chicken winging

by Officer Gori.  (Pl.'s Mot. in Opp. of Summ. J. at 8-9.)  Plaintiff testified that he broke free

from the chicken wing and clasped his hands together in the front of his body, but he did not

disobey any commands or resist the Officers in the process of doing so.  (Paul Fanelli Dep.

1/11/16, p. 178:4-21.)  Officer Owens acknowledges that he grabbed Plaintiff's left arm.  (James

Owens Dep. 1/19/16, p. 38:1-3.)  Plaintiff alleges that when Officer Owens grabbed his left arm,

Officer Gori grabbed his right arm, and they both worked in tandem pulling back and forth and

"whiplashing" him.  (Paul Fanelli Dep. 1/11/16, p. 184:14-21.)  After the whiplashing subsided,

the officers released him from their grip and did not charge him with a crime.  (Pl.'s Mot. in

Opp. of Summ. J. at 8.)

Plaintiff alleges that, as a result of Defendants' use of force, he experienced immediate

shooting pains in his spine, neck, arm, shoulder and face for which he sought medical treatment

from his primary care physician, and for which he continues to treat.  (<u>Id.</u> at 9.)  His headaches persisted, and became debilitating.  (<u>Id.</u>)  He developed post-concussion syndrome, fluid in the ball joint of his right shoulder, as well as trigeminal neuralgia, which is an extremely painful condition that is very difficult to treat.  (<u>Id.</u>)  To date, Plaintiff's medical bills related to this incident are in excess of $71,000.00.  (<u>Id.</u>)

**B.  Defendants' Version of the Events**

Unsurprisingly, Defendants have a very different account of what took place after they arrived at Ms. Fanelli's home.  After Officer McCarrick entered the home, Officer Gori began speaking to Plaintiff who did not listen to any questions and appeared agitated, irate, and belligerent.  (Incident Rept. at 4, 5; David Gori Dep. 1/19/16, pp. 28:23-29:3, 30:12-31:22.) Officer Owens arrived shortly thereafter and also described Plaintiff as agitated and angry. (James Owens Dep. 1/19/16, pp. 22:10-24, 27:13-28:3.)  It is worth noting that contrary to Plaintiff's allegation, Officer Owens was aware that police were called to Ms. Fanelli's home because Plaintiff was fighting with her boyfriend.  (<u>Id.</u> at pp. 47:18-24; 48:21-49:16.)

Defendants allege that Plaintiff then suddenly stood up, placed his hands in his jacket pockets, and began walking towards Officers Gori and Owens.  (<u>See</u> Incident Rept. at 4, 5; David Gori Dep. 1/19/16, pp. 34:22-35:4; James Owens Dep. 1/19/16, p. 28:4-11.)  When both officers repeatedly asked Plaintiff to remove his hands from his jacket pockets, he became argumentative.  (Defs.' Mot. for Summ. J. at 4.)  Officer Owens attempted to explain to Plaintiff that he needed to remove his hands from his pockets, so that he and Officer Gori could ensure that he was not armed, but Plaintiff did not respond.  (<u>See</u> Incident Rept. at 4, 5; David Gori Dep. 1/19/16, p. 35:5-17; James Owens Dep. 1/19/16, pp. 28:12-30:18.)  After multiple requests, Plaintiff eventually removed his hands from his jacket pockets, but immediately placed them in

his front pants pockets.  (David Gori Dep. 1/19/16, p. 35:5-8.)  Officer Gori again repeatedly asked that Plaintiff remove his hands from his pants pockets.  (Id. at p. 35:8-14.)  Plaintiff did not comply.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, pp. 35:5-36:7; James Owens Dep. 1/19/16, pp. 32:24-35:5.)

Due to the report that Plaintiff had been involved in a disturbance during which he threatened violence, his belligerent and angry behavior, his sudden movements, and his reluctance to remove his hands from his pockets, Officer Gori and Officer Owens independently decided to pat down Plaintiff for weapons.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, p. 58:2-13; James Owens Dep. 1/19/16, pp. 34:1-11; 47:17-51:9.)  Officer Owens testified that he did not know what Plaintiff had in his pockets or hands and feared for his own safety.  (James Owens Dep. 1/19/16, p. 47:7-16.)

 After explaining to Plaintiff that they needed to ensure that he was not armed, Officer Owens placed his hand on Plaintiff's shoulder, and began patting down his back.  (See Incident Rept. at 4, 5; James Owens Dep. 1/19/16, pp. 35:4-36:21, 52:1-5.)  Officer Gori placed his hands on Plaintiff's right elbow and hand to remove it from his pocket.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, pp. 36:11-37:3.)  Plaintiff immediately pulled away from Officer Gori's control.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, pp. 37:4-7, 38:11-24; James Owens Dep. 1/19/16, p. 35:4-10.)  Officer Gori then placed his hand on Plaintiff's right wrist while Plaintiff interlocked his hands in front of his chest and argued with the officers.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, p. 39:12-15; James Owens Dep. 1/19/16, p. 39:1-7.)

Plaintiff refused to release his grip, so Officer Gori attempted to pull Plaintiff's hands apart in order to bring his hands to his side to ensure he was not holding any objects.  (See

Incident Rept. at 4; David Gori Dep. 1/19/16, pp. 39:16-40:8, 50:5-51:10; James Owens Dep. 1/19/16, p. 40:11-19.)  It appeared to Officer Owens that Plaintiff was attempting to conceal an item in his clasped hands.  (See James Owens Dep. 1/19/16, pp. 41:17-42:9.)  Plaintiff was repeatedly ordered to cease resisting and Officer Gori began to search him for weapons.  (See Incident Rept. at 4; David Gori Dep. 1/19/16, pp. 40:9-16, 41:18-22; James Owens Dep. 1/19/16, p. 40:16-23.)

Officer Owens placed his hand on Plaintiff's left wrist and patted down his legs, groin, waistband, and pockets.  (See James Owens Dep. 1/19/16, pp. 37:19-38:24, 53:10-54:5, 74:18-23.)  While searching Plaintiff, Officer Gori attempted to maintain control and ensure that Plaintiff could not strike him by pushing Plaintiff's wrist towards his chest.  (See David Gori Dep. 1/19/16, pp. 44:21-45:12.)  At some point during this interaction, Plaintiff told the officers that he had undergone neck surgery.  (See James Owens Dep. 1/19/16, pp. 37:14-18.)  Ms. Fanelli exited her home and made a similar statement.  (See Incident Rept. at 4, 5; David Gori Dep. 1/19/16, p. 47:2-15; James Owens Dep. 1/19/16, pp. 37:14-18, 42:18-43:4.)  Once the search was completed, Officer Gori released Plaintiff's wrist. (See Incident Rept. at 4; David Gori Dep. 1/19/16, p. 40:14-18.)  Throughout the search, Defendants allege that Plaintiff continued to refuse orders to release his hands from in front of his body.  (See David Gori Dep. 1/19/16, p.42:21-43:13.)

Once satisfied Plaintiff did not have any weapons, Officer Gori and Officer Owens released him and continued to question him about the disturbance call that they received.  (See David Gori Dep. 1/19/16, pp. 45:23-46:22; James Owens Dep. 1/19/16, p. 42:13-17.)  Defendants contend that at no time did Plaintiff state he was in pain or appear to be injured.  (See

David Gori Dep. 1/19/16, pp. 45:23-46:22; James Owens Dep. 1/19/16, p. 45:12-18; Richard McCarrick Dep. 1/19/2016, pp. 42:9-15, 43:5-8.)

## II.        STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law" See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a

summary judgment motion.  Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).

If the court determines that there are no genuine issues of material fact, then summary judgment

will be granted.  Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.  Excessive Force Claim (Count I) Against Officer Owens

We first consider whether Plaintiff has presented enough evidence to create a genuine

issue of material fact regarding his claim against Officer Owens for excessive force.  As noted,

Plaintiff brings his claim pursuant to 42 U.S.C. § 1983 arguing that Officer Owens and Officer

Gori used excessive force against him in violation of his Fourth Amendment rights.  Defendants

only moved for summary judgment regarding the claims against Officer Owens, so our analysis

will be limited accordingly.

The United States Supreme Court ("Supreme Court") has explained that "[w]here . . . the

excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is

most properly characterized as one invoking the protections of the Fourth Amendment, which

guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures."

Graham v. Connor, 490 U.S. 386, 394 (1989) (internal citations and quotations omitted).  We

thus analyze excessive force claims in the arrest context under the Fourth Amendment's

"objective reasonableness" standard, see, e.g., Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007)

(citing Graham, 490 U.S. at 388), and so "to state a claim for excessive force as an unreasonable

seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it

was unreasonable."  Estate of Smith v. Marasco, 430 F.3d 140, 148 (3d Cir. 2005) (internal

quotations and alterations omitted).

When determining whether a defendant's actions were reasonable, the court should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).  Other relevant factors may include "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004).  The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that physical injury may be relevant to the use of force analysis, but that an injury is not a prerequisite to establishing excessive force.  Sharrar v.  Felsing, 128 F.3d 810, 822 (3rd Cir. 1997).

Plaintiff cites Third Circuit case law for the incorrect proposition that the test for "reasonableness under the Fourth Amendment should frequently remain a question of fact for the jury."  (Pl.'s Mot. in Opp. of Summ. J. at 15-16 (citing Kopec, 361 F.3d at 777) (quoting Abraham v. Raso, 183 F.3d 279, 288 (3rd Cir. 1999)).  This is not current law after a more recent decision by the Supreme Court in Scott v. Harris, 550 U.S. 372 (2007).  The Supreme Court in Scott explained that "[a]t the summary judgment stage . . . once [the court] ha[s] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [the officer's] actions . . . is a pure question of law."  Id. at 381 n.8.

Here, there is a genuine dispute of material fact regarding the use of force by Officer Owens; therefore, summary judgment is not warranted.  The events of what took place vary

greatly depending on which party is telling the story. Defendants contend that Plaintiff had a hostile demeanor when they arrived, and that he refused to comply with their orders. (Defs.' Mot. for Summ. J. at 8-10.) Essentially, Defendants argue that since the nature of the visit was a disturbance call and Plaintiff was arguing with the officers, refusing to comply with their orders, and denying requests to remove his hands from his front pockets, it was reasonable for Officer Owens to grab Plaintiff's left shoulder and pat down his legs, groin, and pockets for a weapon. (Id.) Conversely, Plaintiff contends that Officer Owens and Officer Gori did not simply pat him down; rather, they both worked in tandem to "whiplash" him back in forth by his arms. (Pl.'s Mot. in Opp. of Summ. J. at 12-15.) Additionally, Plaintiff contends that he was not resisting arrest, and that the force was applied without any prior verbal commands. (Id.)

There are clearly disputes over material facts regarding what occurred after the police arrived. Defendants appear to feel entitled to summary judgment because they want us to adopt their version of what took place. However, that is not something we are entitled to do under these circumstances. See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor.") (internal citations and quotations omitted). This is not a situation where Plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." See Scott, 550 U.S. at 380-81. Under these circumstances, a jury could conclude that Officer Owens did assist Officer Gori in whiplashing Plaintiff back and forth, and this application of force was objectively unreasonable in violation of the Fourth Amendment. Therefore, summary judgment is denied for Count I alleging Officer Owens used excessive force.

**B.  Failure To Intervene/Bystander Liability Claim[3] (Count II)**

We next consider whether Plaintiff has presented enough evidence to create a genuine issue of material fact regarding his claim for failure to intervene/bystander liability under the Eight Amendment.  We find that there is a material factual dispute regarding what exactly occurred and summary judgment is not warranted against Officer Owens; however, summary judgment is warranted for the claim against Officer McCarrick.

Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior.  Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."  Id. at 650-51 (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)).  However, an officer is only liable if there is a realistic and reasonable opportunity to intervene.  See Clark, 783 F.2d at 1007 (instructing the district court upon remand to determine whether the officer was in a position to intervene); Putman v. Gerloff, 639 F.2d 415, 423-24 (8th Cir. 1981) (liability exists only if the non-intervening officer saw the beating or had time to reach the offending officer); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972) (liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge).

To the extent Plaintiff brings suit against Officer McCarrick for failing to intervene, summary judgment must be granted.  Officer McCarrick was not involved in securing or searching Plaintiff before he entered Ms. Fanelli's home and the interaction between Plaintiff

---

[3] Plaintiff refers to Count II as bystander liability; however, this is synonymous with failure to intervene.  See Goldwire v. City of Phila., 130 F. Supp. 3d 936, 940 (E.D. Pa. 2015) (referencing a single cause of action as "bystander liability or failure to intervene").  Since both terms are used interchangeably, we will use failure to intervene throughout our analysis to avoid confusion.

and Officers Gori and Owens ended before Officer McCarrick returned outside.  (See Richard McCarrick Dep. 1/19/2016, pp. 33:24-35:9, 40:24-41:6.)  Furthermore, Plaintiff's contention that cries of pain prompted Officer McCarrick to leave the home is contradicted by his own testimony wherein he stated that Officer McCarrick was not outside the house during the alleged use of force by Officer Gori.[4]  (See Paul Fanelli Dep. 1/11/16, pp. 173:22-174:5.)

There was simply no opportunity for Officer McCarrick to intervene and stop the alleged excessive force since he arrived as Plaintiff was being released from Officers Gori and Owens's control.  (See Richard McCarrick Dep. 1/19/2016, p. 35:5-24.)  Nothing in the record indicates that Officer McCarrick was in close proximity to the alleged excessive force, so that he could have potentially thwarted Officer Gori or Officer Owens' alleged actions.  Thus, Officer McCarrick did not have a reasonable opportunity to intervene as the alleged excessive force did not take place in his presence.  See Clark, 783 F.2d at 1007; Brishke, 466 F.2d at 11.  Therefore, summary judgment is warranted for the failure to intervene claim against Officer McCarrick.

However, summary judgment is not proper for the claim against Officer Owens.  Officer Owens, by every account, was standing next to Officer Gori when he allegedly began chicken winging Plaintiff.  (See Paul Fanelli Dep. 1/11/16, p. 168:8-11; Incident Rept. at 4, 5; David Gori Dep. 1/19/16, p. 58:2-13; James Owens Dep. 1/19/16, pp. 34:1-11; 47:17-51:9.)  Standing directly next to Officer Gori, Officer Owens was in a position to intervene and had a realistic and reasonable opportunity to do since it was only the Officers and Plaintiff present at the scene of the alleged incident.  Although Defendants contend they were simply patting Plaintiff down, Plaintiff contends that Officer Gori chicken winged him while Officer Owens stood there in

---

[4]  See Scott, 550 U.S. at 380-81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

silence and watched.  Thus, there is a material factual dispute regarding what exactly occurred and summary judgment is not warranted for the failure to intervene claim against Officer Owens.

### C.  Conspiracy Claim (Count III)

We are next confronted with the issue of whether there was a conspiracy among Officers McCarrick, Owens, and Gori to violate Plaintiff's constitutional rights.   An actor who does not directly commit a violation of constitutional rights can nonetheless be held liable under 42 U.S.C. 1983 if he or she engaged in a conspiracy with others to commit such violations.  Cnty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 175 (3d Cir. 2006).  In order to prevail on a Section 1983 conspiracy claim, a plaintiff must prove (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to that conspiracy.  See Adickes v. S. H. Kress & Co., 398 U.S. 144, 150 (1970); Rosembert v. Borough of East Lansdowne, 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014).

 "In order to survive summary judgment, plaintiff must demonstrate that there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding to achieve the conspiracy's objective." Fioriglio v. City of Atlantic City, 996 F. Supp. 379, 386 (D.N.J. 1998) (quoting Adickes, 398 U.S. at 158–59 (internal quotations omitted)); see also Startzell v. City of Phila., 533 F.3d 183, 205 (3d Cir. 2008) (explaining that a plaintiff must show there was an agreement or meeting of the minds to violate their constitutional rights).  "Plaintiff must prove with specificity the circumstances of the alleged conspiracy, such as those addressing the period of conspiracy, object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose."  Id. (citing Labalokie v. Capital Area Intermediate Unit, 926 F. Supp. 503, 508 (M.D. Pa. 1996) (internal quotations omitted)).  Where a civil rights conspiracy is alleged, there must

be some specific facts in the complaint which tend to show a meeting of the minds and some type of concerted activity.  Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir. 1985).  A plaintiff cannot rely on subjective suspicions and unsupported speculation.  Young v. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991).

Here, Plaintiff has failed to allege that there was a "meeting of the minds" among Defendants.  Plaintiff contends that there was a meeting of the minds to violate his constitutional rights because Officer Owens and Officer McCarrick were aware that Officer Gori was applying unconstitutional force when he chicken winged Plaintiff, and they stood by and acquiesced in the behavior.  (Pl.'s Mot. in Opp. of Summ. J. at 17-18.)  Plaintiff adds that this is evidenced by the fact that he screamed out in pain and had previously informed Defendants of his prior neck surgery.  (Id.)  On the other hand, Defendants basically contend that Officer McCarrick remained inside when Officers Gori and Officer Owens independently decided to pat down Plaintiff for weapons.  (Defs.' Mot. for Summ. J. at 12-13.)

Plaintiff alleges that the case of Adickes stands for the proposition that a meeting of the minds can occur "with something as subtle as a nod, or even just the presence of a police officer while an unconstitutional act is going on."  (Pl.'s Mot. in Opp. of Summ. J. at 18) (citing Adickes, 398 U.S. 144).  However, this is simply not the case.  Besides incorrectly citing Adickes for this proposition, Plaintiff fails to cite to any case alleging that the mere acquiescence of unlawful behavior is sufficient to show that there was a "meeting of the minds" for a conspiracy claim.[5]

---

[5] Although not cited by either party, we do recognize that the United States Court of Appeals for the Fourth Circuit held that "[a]cquiescence can amount to a conspiracy agreement when . . . one police officer watches an open breach of the law and does nothing to seek its prevention."  See Hafner v. Brown, 983 F.2d 570, 578 (4th Cir.1992).  However, not only is this decision not binding on us, over twenty years have passed since Hafner, and in that time, not one Circuit, including the Third Circuit, has never cited it for the principle that merely observing a violation amounts to a conspiracy.

In <u>Adickes</u>, the petitioner, a white New York teacher who, in 1964, volunteered to teach at a Mississippi "Freedom School," was denied service at a lunch counter when she attempted to eat with her six black students.  <u>Adickes</u>, 389 U.S. at 149.  After being so denied, she and her class exited the restaurant, at which time, a police officer, "'who had previously entered [the] store,' arrested petitioner on a groundless charge of vagrancy and took her into custody."  <u>Id.</u> The teacher then brought a § 1983 action against the restaurant, alleging that both the refusal to serve her and the arrest were the product of a conspiracy between the restaurant and the town police.  <u>Id.</u> at 149-50.

In reversing the lower court's grant of summary judgment in favor the respondents, the Court focused on the joint activity of the parties.  Consistent with the law of conspiracy, the Court found it highly unlikely that a police officer, who had been in the restaurant at the same time as the petitioner, just happened to coincidentally arrest petitioner on a baseless charge immediately after she left the restaurant.  <u>Id.</u> at 159.  Consequently, the Court maintained that the conspiracy claim would fail only if respondents could prove that the police officer was not in the restaurant at the same time as petitioner.[6]  <u>Id.</u>  The Court found it "particularly noteworthy that the two officers involved in the arrest each failed in his affidavit to foreclose the possibility (1) that he was in the restaurant while petitioner was there; and (2) that, upon seeing petitioner with Negroes, he communicated his disapproval to a [restaurant] employee, thereby influencing the decision not to serve petitioner."  <u>Id.</u> at 159.

---

[6] "<u>Adickes</u> thus led many courts to conclude that the defendant has the burden of actually disproving the existence of all material facts in order to prevail on a motion for summary judgment."  <u>Morris v. Orman</u>, No. 87-5149, 1989 WL 17549, at *10 (W.D. Pa. March 1, 1989) (citing Louis, <u>Federal Summary Judgment Doctrine: A Critical Analysis</u>, 83 Yale L.J. 745 (1974)).  However, Supreme Court cases suggest that courts have been reading <u>Adickes</u> too broadly.  <u>See id.</u> at *10-12 (explaining in detail how the Supreme Court's decisions in <u>Celotex</u>, 477 U.S. 317, <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith</u>, 475 U.S. 574 (1986) do not explicitly overrule <u>Adickes</u>; however, the decisions do suggest that the extremely stringent standard of <u>Adickes</u> need not apply in every federal civil conspiracy claim).

Contrary to Plaintiff's beliefs, <u>Adickes</u> did not hold that an officer's mere presence at the scene was enough to show a meeting of the minds.  Rather, the Court in <u>Adickes</u> stated that a jury could infer, based on the officer's presence, that there was a meeting of the minds between the officer and the restaurant employee because of the sequence of events that took place soon thereafter.  <u>Id.</u> at 159.  It was simply too coincidental that the officer arrested the petitioner on a baseless charge right after she left the restaurant where she was improperly refused service.  <u>Id.</u> Thus, it was not the officer's presence alone that showed a meeting of the minds; rather, it was the officer's presence combined with all of the events that took place that showed the possibility that the officer and the restaurant employee came to some understanding to refuse the petitioner service.

Here, Plaintiff relies on nothing more than mere suspicion and unsupported speculation for his conspiracy claim, which is something that he cannot do.  <u>See</u> <u>Young</u>, 926 F.2d at 1405 n.16. Regarding Officer McCarrick, he was not involved in securing or searching Plaintiff as the interaction ended and Plaintiff had been released by the time that he arrived.  (<u>See</u> Richard McCarrick Dep. 1/19/2016, pp. 33:24-35:9, 40:24-41:6.)  Regarding Officer Gori and Officer Owens, they indicated in their depositions that they did not discuss with each other whether to pat Plaintiff down prior to touching him.  (<u>See</u> James Owens Dep. 1/19/16, pp. 34:1-11; 47:17-51:9; David Gori Dep. 1/19/16, p. 58:2-13.)

Plaintiff has failed to provide any evidence or allege specific facts showing that there was a meeting of the minds between Defendants.  Officer McCarrick was not even present when the alleged constitutional violations occurred, and Officers Gori and Owens independently attempted to search Plaintiff.  These facts are distinguishable from the ones in <u>Adickes</u> to which Plaintiff attempts to rely upon.  Here, unlike the officers in <u>Adickes</u>, Officers McCarrick, Owens, and

Gori all foreclose the possibility that there was a conspiracy among them by indicating that they were either not at the scene when the alleged constitutional violation took place, i.e., Officer McCarrick, or did not communicate with each other regarding patting Plaintiff down prior to taking action, i.e. Officers Gori and Owens.  Furthermore, the facts are not so coincidental that there almost had to be a meeting of the minds like in <u>Adickes</u>.  It does not matter whether we adopt Plaintiff's or Defendants' version of the facts, unlike in <u>Adickes</u>, either scenario could have likely occurred without a meeting of the minds.  Plaintiff has failed to allege specific facts in his Complaint which tend to show a meeting of the minds.  Therefore, summary judgment will be granted as it pertains to Plaintiff's conspiracy claim.

### D.  Supervisor Liability Claim (Count IV)

Plaintiff contends that Officer Owens is liable for failing to properly supervisor his subordinate Officers.  "According to traditional Third Circuit precedent, supervisory personnel are only liable under § 1983 if they participated in or had knowledge of violations, if they directed others to commit violations, or if they had knowledge of and acquiesced in subordinates' violations." <u>Park v. Veasie</u>, 720 F. Supp. 2d 658, 667 (M.D. Pa. 2010) (citing <u>Baker v. Monroe Twp.</u>, 50 F.3d 1186, 1191 (3d Cir. 1995)).  However, several courts have noted that with the decision in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), "the Supreme Court cast doubt on the viability of this standard for holding government officials liable based on a theory of supervisory liability under § 1983."  <u>See</u> <u>id.</u>; <u>Williams v. Lackawanna Cnty. Prison</u>, No. 07-1137, 2010 WL 1491132, at *4 (M.D. Pa. Apr. 13, 2010); <u>Brickell v. Clinton County Prison Bd.</u>, 658 F. Supp. 2d 621, 625-26 (M.D. Pa. 2009).  In <u>Iqbal</u>, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to <u>Bivens</u> [<u>v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)] and § 1983 suits, a plaintiff must plead that each

19

Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. The Court also emphasized that "[i]n a § 1983 suit or a Bivens action - where masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Id. at 677.

The Third Circuit has recognized the potential effect that Iqbal might have in altering the standard for supervisory liability in a Bivens or a § 1983 suit. See Bayer v. Monroe County Children and Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009) (noting that, in light of Iqbal, "it is uncertain whether proof of . . . personal knowledge [concerning a Fourteenth Amendment violation of procedural due process], with nothing more, would provide a sufficient basis for holding [the defendant] liable with respect to plaintiffs' Fourteenth Amendment claims under § 1983").

"However, it appears that, under a supervisory theory of liability, and even in light of Iqbal, personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right." See Park, 720 F. Supp. 2d at 667; Williams, 2010 WL 1491132, at *4; Brickell, 658 F. Supp. 2d at 625-26. Thus, it remains unlikely that Plaintiff can rely on the simple fact that Officer Owens allegedly acquiesced in Officer Gori's violations to establish a claim for supervisor liability in light of the Iqbal ruling. However, we have already determined that a jury could conclude that Officer Owens used excessive force against Plaintiff in violation of the Fourth Amendment. Additionally, Officer Owens did testify that he was the officer in charge on the day of the incident. (James Owens Dep. 1/19/16, p. 14:11-14.) Therefore, a jury could conclude that Officer Owens, as the supervising officer, was

personally involved in the violation of Plaintiff's Constitutional rights making summary judgment improper at this time.

### E.  **Monell** Claim (Count V)

Although it is not made abundantly clear, Plaintiff appears to bring both a Monell claim and a failure to train claim against Lansdale.  While the legal standards governing these claims are similar in many respects, I will consider the claims individually below.

### *1.  Monell Claim Regarding Municipal Policy or Custom*

The municipal liability claims at issue in the instant Motion arise under 42 U.S.C. § 1983. Under § 1983 "a municipality cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable . . . on a respondeat superior theory."  Monell, 436 U.S. at 691.  Rather, liability under § 1983 attaches to a municipality only where the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Id. at 694.  Thus, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).

Therefore, the municipality is liable if the plaintiff can establish: (1) the municipality had a policy[7] or custom[8] that deprived him of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) his injury was caused by the identified policy or custom.  Bryan Cnty., 520 U.S. at 403–04 (citing, inter alia, Monell, 436 U.S. at 690–91, 694).

---

[7] A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers."  See Monell, 436 U.S. at 690.

[8] A custom "is an act 'that has not been formally approved by an appropriate decision-maker,' but that is 'so widespread as to have the force of law.'"  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)).

Here, Plaintiff does not allege that the underlying policies or directives instruct Lansdale police officers to engage in unconstitutional behavior.  (Am. Compl. ¶¶ 62-69.)  Nor does Plaintiff allege that the policies or directives instructed the Defendant Officers to use the force they allegedly did, i.e., the chicken wing and whiplash.  (Pl.'s Mot. in Opp. of Summ. J. at 20-22.)  Rather, Plaintiff argues that Lansdale was deliberately indifferent for failing to enact adequate policies and directives related to pat down searches and the use of force. [9]  (Id.)

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Bryan Cnty., 520 U.S. at 410.  Ordinarily, "[a] pattern of similar constitutional violations" is necessary "to demonstrate deliberate indifference."  Connick v. Thompson, 563 U.S. 51, 62 (2011).  "Nevertheless, the Supreme Court posited in Canton that in certain situations, the need . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights even without a pattern of constitutional violations."  Thomas v. Cumberland Cnty., 749 F.3d 217, 223 (3d Cir. 2014) (citing Canton, 489 U.S. at 390 n.10 (internal quotations omitted)).  Accordingly, to survive summary judgment under this deliberate indifference standard, "the plaintiff must produce facts tending to show the City knew of a pattern of constitutional violations or that such consequences were so obvious the City's conduct can only be characterized as deliberate indifference."  Pelzer, 656 F. Supp. 2d at 531-32 (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).  We will address each possible avenue for liability separately below.

---

[9] "Although the deliberate indifference standard was originally used for suits alleging a failure to train police officers, this standard has been adopted in other municipal policy/custom liability cases."  Pelzer v. City of Phila., 656 F. Supp. 2d 517, 533 n.26 (E.D. Pa. 2009) (citing Beck v. City of Pittsburgh, 89 F.3d 966, 971–72 (3d Cir. 1996) (citing Simmons v. City of Phila., 947 F.2d 1042, 1070 (3d Cir. 1991)).

### a.   Pattern of Constitutional Violations

Plaintiff has not alleged that Lansdale knew of a pattern of constitutional violations. Plaintiff has not identified a single incident of excessive force used by any other officers in the Lansdale Police Department.  Additionally, none of the Defendants have ever been accused of using excessive force prior to this incident.  (Defs.' Mot. for of Summ. J. Ex. J, Defendant Officers' Answers to Interrogatories.)  Plaintiff has had an opportunity to conduct discovery regarding Lansdale's police practices, and at the summary judgment stage, he has been unable to present evidence of any unconstitutional patterns or practices.  Therefore, Plaintiff cannot rely on this theory for his "deliberate indifference" argument.

### b.   Obvious

Since he has not shown a pattern of constitutional violations, Plaintiff must prove that the need for government action was "'so obvious,' that [Lansdale's] failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[10] Canton, 489 U.S. at 390 n.10.  This is often referred to as the Canton "single-incident" standard.  In these situations, "courts should consider '[t]he likelihood that [a] situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights'" Pelzer, 656 F. Supp. 2d at 531-32 (citing Bryan Cnty., 520 U.S. at 409).  "This indicates recurrence, apparentness, and the likelihood of constitutional injury are a few of the factors to be taken into account."  Id. (citing Walker v. City of New York, 974 F.2d 293, 297–98 (2d Cir. 1992)).

The Supreme Court in Canton offered a hypothetical example of this "single-incident" liability:

---

[10] "Though drawn from a different context, language explaining deliberate indifference with respect to failure to train claims has been used generally and is instructive on what kinds of consequences are obvious or not."  Pelzer, 656 F. Supp. 2d at 534.

> city policymakers know to a moral certainty that their police
> officers will be required to arrest fleeing felons.  The city has
> armed its officers with firearms, in part to allow them to
> accomplish this task.  Thus, the need to train officers in the
> constitutional limitations on the use of deadly force . . . can be said
> to be 'so obvious,' that failure to do so could properly be
> characterized as 'deliberate indifference' to constitutional rights.

Canton, 489 U.S. at 390 n.10.  However, the Supreme Court in Connick, found that a district

attorney's failure to train his prosecutors "in their Brady obligations d[id] not fall within the

narrow range of Canton's hypothesized single-incident liability."  563 U.S. at 64.  The Court

reasoned that "[a]ttorneys are trained in the law and equipped with the tools to interpret and

apply legal principles, understand constitutional limits, and exercise legal judgment."  Id.  In

contrast to Canton, there was "no reason to assume that police academy applicants are familiar

with the constitutional constraints on the use of deadly force.  And, in the absence of training,

there is no way for novice officers to obtain the legal knowledge they require.  Under those

circumstances there is an obvious need for some form of training."  Id.

        The Court offered further contrast by noting that the City of Canton "hypothetical[ly]

assume[d] that the armed police officers ha[d] no knowledge at all of the constitutional limits on

the use of deadly force," while in Connick it was undisputed "that the prosecutors . . . were

familiar with the general Brady rule."  Id. at 67.  Thus, we must determine whether our case

more closely resembles "the plainly obvious need to train armed police officers 'in the

constitutional limitations on the use of deadly force' in Canton . . . [or] the lack of such an

obvious need in Connick, where prosecutors had a legal education and ethical obligations and the

allegedly necessary training was nuanced."  Thomas v. Cumberland Cnty., 749 F.3d 217, 225 (3d

Cir. 2014) (internal citations omitted).

The Third Circuit in <u>Thomas</u> offers some further guidance.  The Court held that the circumstances of its case were more similar to those in <u>Canton</u> than <u>Connick</u>.  In <u>Thomas</u>, a prisoner filed a § 1983 suit based on being attacked by other inmates.  <u>See id.</u> at 219.  "The attack occurred after a several-minute long verbal argument between [the prisoner] and a group of [other] inmates in the presence of corrections officers" who "could tell that a fight was imminent" but did not interfere until the prisoner suffered an injury that "left [him] with no sight in one eye."  <u>Id.</u> at 219–20.  The plaintiff alleged that Cumberland County was liable under the "single incident theory" since it was deliberately indifferent for failing to train its officers in conflict de-escalation and intervention training as part of its mandatory pre-service training requirements.  <u>Id.</u> at 223.

 The Court in <u>Thomas</u> held that the case should have been permitted to go to trial since the plaintiff "put forward evidence that fights regularly occurred in the prison" and that the "frequency of fights" along with "the volatile nature of the prison" made a violation of rights likely to occur if the guards were not given de-escalation and intervention training, thus demonstrating that the failure to provide intervention training established the requisite "deliberate indifference" on the part of the municipality.  <u>Id.</u> at 225-26.

Another case analyzing similar facts to the one before us was <u>Pelzer</u>.  656 F. Supp. 2d 517.  The Court in <u>Pelzer</u> was tasked with determining whether the city was deliberately indifferent for failing to implement foot pursuit and partner splitting policies for its police force. <u>See id.</u> at 531-36.  The Court held that the city was not on notice of past constitutional violations; however, the city's failure to implement these policies was arguably an obvious error that should be left for the jury to decide.  <u>See id.</u> at 533-35.  The Court held:

> Here, there was no stated policy or custom, but a reasonable jury
> could find the failure to establish pursuit policies creates a

> sufficiently obvious risk to the rights of pursuit subjects. Foot
> pursuits are hardly uncommon for a police force serving a city as
> large and populous as Philadelphia. Accepting this statement as
> true, the failure to provide a policy or guidelines could be
> considered an apparent or obvious omission. A jury may also be
> able to conclude that the issue of pursuit and patrol policies are the
> result of a policymaker's decision, and that the City's omission
> was the moving factor behind the plaintiff's injury.

Id. at 535. However, the plaintiff in that case provided the court with a report on the training

academy, which concluded that the officers had "virtually no training in foot pursuits." Id. The

report also included interviews of numerous police officers and concluded that "officers and

supervisors [were] not adequately trained or given clear direction on the appropriate response to

situations." Id. In addition to the report addressing the training, plaintiff presented the court

with numerous statistics that a jury could conclude showed deficiencies in its training programs.

Id.

Here, although not precisely analogous, we find that this case more closely resembles

Connick than it does Canton. Plaintiff's expert noted that Lansdale and/or its police chief "failed

to produce a written policy that would limit discretion and help guide their officers on how to

conduct 'pat downs' of individuals." (Expert Rept. at 4.) The expert opined that this falls below

generally accepted standards regarding written policy and procedures. (See id.) When Officer

Gori was asked if he was trained in pat down techniques, he responded, "not per se." (See David

Gori Dep. 1/19/16, p. 10:11-13.) However, Officers Owens and McCarrick did indicate that they

were trained in pat down searches. (See James Owens Dep. 1/19/16, p. 40:2-4; Richard

McCarrick Dep. 1/19/2016, p. 8:19-21.)

The obvious need to train police officers who lack knowledge of the constitutional

constraints on the use of deadly force that we saw in Canton parallels the obvious need to train

police officers who lack knowledge of the constitutional constraints on how to perform a proper

26

pat down search.  Relying on <u>Canton</u>, the Courts in <u>Thomas</u> and <u>Pelzer</u> both focused on the fact

that there was a complete lack of training to show "deliberate indifference."  <u>Thomas</u>, 749 F.3d

at 226 (noting that there was a "complete lack of training on de-escalation and intervention");

<u>Pelzer</u>, 656 F. Supp. 2d at 535 (noting that the officers had "virtually no training in foot

pursuits").

   Here, there is not a complete lack of training; rather, the expert simply identified

deficiencies in the written policy.  The Expert Report did not question any Lansdale police

officers or delve into the question of whether the Officers were actually trained in the area like

the expert did in <u>Pelzer</u>, which was a fact the <u>Pelzer</u> Court relied upon to deny summary

judgment.  <u>Pelzer</u>, 656 F. Supp. 2d at 535-36.  Both Officer Owens and Officer McCarrick did

indicate that they were trained in pat down searches.  (<u>See</u> James Owens Dep. 1/19/16, p. 40:2-4;

Richard McCarrick Dep. 1/19/2016, p. 8:19-21.)  Although Officer Gori indicated he was not

"per se" trained, he provided a detailed explanation of why and how to perform a "Terry Stop,"

which is a term commonly used for a pat down search, thereby, indicating that he has adequate

knowledge in the area.  (<u>See</u> David Gori Dep. 1/19/16, p. 11:6-14:3.)  This is not a situation

where the Officers lacked a complete knowledge in the area like in <u>Pelzer</u> and <u>Thomas</u>.  Rather,

just as in <u>Connick</u> were the prosecutors were familiar with the <u>Brady</u> rule, Defendants here are

knowledgeable and familiar with pat down searches from their previous training.

   Additionally, Plaintiff did not provide the characteristics of probability like those cited in

<u>Thomas</u>.  It is unclear whether pat down searches occur frequently within Lansdale.  Considering

all of this evidence, and the fact that the deliberate indifference standard is stringent, we find that

summary judgment is appropriate.  Although not having a written policy on pat down searches

may fall below the generally accepted standards according to Plaintiff's expert, this does not

mean that Lansdale was deliberately indifferent.  Simply put, Plaintiff did not provide statistics of the frequency of these pat down searches, like we saw in <u>Thomas</u>, nor was there a complete lack of training, like we saw in <u>Thomas</u>, <u>Canton</u>, and <u>Pelzer</u>.  Rather, the undisputed facts indicate that the Defendant Officers were trained in pat down searches.  Whether there were adequate written rules regarding the searches is not as clear; however, there is not an "obvious need" to train like we saw in <u>Canton</u>.  We find that this type of omission does not rise to the heighted level of "deliberate indifference."  <u>Bryan Cnty.</u>, 520 U.S. at 410.

Similarly, we reject Plaintiff's argument that Lansdale was deliberately indifferent for not having an up to date directive on the use of force.  (Pl.'s Mot. in Opp. of Summ. J. at 20-22.)  Plaintiff's expert opined that Lansdale's use of force policy failed to meet the national standard regarding a law enforcement officer's force for seizing a person.  (Expert Rept. at 5.)  However, Plaintiff's expert also indicated that "law enforcement officers are taught about the use of force in the law enforcement academy, and also in-service, as well as other training programs authorized by their agency and the state."  (<u>Id.</u>)  Defendants also indicate that they have mandatory state-training on the use of force provided under the state governing body – the Pennsylvania Municipal Police Officers Training and Education Commission.  (Defs.' Mot. for of Summ. J. at 17-18.)  Similar to the pat down searches claim, the failure to have a contemporary use of force directive does not rise to the level of "deliberate indifference" as the Officers had extensive training in the area.

We note that Plaintiff has cited zero instances of prior excessive force claims by Lansdale's police officers.  Although this is not a requirement since Lansdale could still be liable under the <u>Canton</u> "single incident" standard, we do find that the fact that Plaintiff has not found one prior incident of excessive force indicative of the adequacy of the training program.

Consequently, we find that Lansdale's directive regarding use of force was not so deficient as to consider it "deliberate indifference," as that term is defined by Canton.  See 489 U.S. at 390 n.10.  Therefore, summary judgment will be granted in favor of Defendants.

### 2.   Failure to Adequately Train

Municipality liability under § 1983 may also relate to the training of police officers.[11] Canton, 489 U.S. at 388.   However, the liability occurs in limited circumstances and only exists if two requirements are met.  See id. at 388-90.  First, this liability arises "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id.  Second, "the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury."  Id. at 391.  The Supreme Court explained this limited scope of liability for failure to train:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.

This deliberate indifference is the same strict standard as discussed above.  See Bryan Cnty., 520 U.S. at 410.  "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose

---

[11] Although not relevant to our case, it is worth noting that a municipality may also be liable, in very limited circumstances, for failing to adequately screen the employees before hiring them.  See Bryan Cnty., 520 U.S. at 411 (holding that a city is only liable when "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right").

to retain that program." <u>Connick</u>, 563 U.S. at 61 (citing <u>Bryan Cnty.</u>, 520 U.S. at 407).  Again, if there is not a history of past constitutional violations, a plaintiff may rely on a single incident when the failure to train "'so obvious,' that its failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  <u>See</u> <u>Canton</u>, 489 U.S. at 390 n.10; <u>Bryan Cnty.</u>, 520 U.S. at 409 (noting that "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference'").

"[A] municipality's deliberately indifferent failure to train is *not* established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct."  <u>Simmons v. City of Phila.</u>, 947 F.2d 1042, 1060 (3d Cir. 1991).  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality - a 'policy' as defined by [the Court's] prior cases - can a city be liable for such a failure under § 1983."  <u>Canton</u>, 489 U.S. at 389.

Here, we find that Plaintiff has failed to establish that Lansdale's training practices rose to the stringent standard of "deliberate indifference."  <u>Bryan Cnty.</u>, 520 U.S. at 410.  This "deliberate indifference" standard and facts are all the same from our earlier analysis above, and we adopt all of that reasoning here.  <u>See</u> supra Section E(1).  Although there may have been some flaws in the policies and directives, we find that Plaintiff has not shown that the Defendant Officers actually lacked adequate training.  Without a showing by Plaintiff of a lack of adequate training, it is not "so obvious" to Lansdale that their training was deficient.  Also, without any evidence of prior constitutional violations, it indicates that the training had been sufficient prior

to the alleged conduct in this case.  Plaintiff is attempting to use the argument that better training would have possibly avoided this alleged injury causing conduct by Defendants; an argument that has been rejected by the Third Circuit.  See Simmons, 947 F.2d at 1060.  Therefore, summary judgment will be granted in favor of Lansdale for Count V.

### F.  Qualified Immunity for Officer McCarrick and Officer Owens

Defendants argue that even if the issue of whether there was a Constitutional violation was too close to call, Officer McCarrick and Officer Owens are nevertheless entitled to qualified immunity.  (Defs.' Mot. for of Summ. J. at 14-16.)  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pelzer, 656 F. Supp. 2d at 535 (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citations omitted)).  "It balances the interests in ensuring officials are held accountable when they act irresponsibly in their positions while shielding them 'from harassment, distraction, and liability' when they act responsibly."  Id.

To determine whether this immunity applies, the Supreme Court provided a two-step analysis in Saucier v. Katz, 533 U.S. 194 (2001).  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  "If the answer is no, then the inquiry is concluded.  If, on the other hand, the plaintiff has satisfied the first step, the court 'must ask whether the right was clearly established.'"  Pelzer, 656 F. Supp. 2d at 535 (quoting Saucier, 533 U.S. at 201).

Here, I will deny the Motion as it pertains to Officer Owens.  As discussed earlier, there are genuine disputes regarding the material facts of whether Officer Owens violated Plaintiff's Fourth Amendment rights by using excessive force, and Plaintiff's Eight Amendment rights for

failing to intervene when he allegedly stood by as Officer Gori used excessive force against Plaintiff.  Because we are unable to conclusively determine, at this time, whether Officer Owens violated Plaintiff's constitutional rights, the inquiry is concluded and Officer Owens is not entitled to qualified immunity at this time.

However, I will grant the Motion as it pertains to Officer McCarrick.  As outlined above, we have determined as a matter of law that Officer McCarrick has not violated any constitutional rights of Plaintiff.  Therefore, Officer McCarrick is entitled to qualified immunity.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.  The Motion is denied with respect to Counts I and IV alleging excessive force and supervisor liability against Officer Owens.  For Count II alleging failure to intervene, summary judgment is granted as it relates to Officer McCarrick, but it is denied as it pertains to Officer Owens.  For Counts III and V alleging conspiracy and municipality liability, summary judgment is granted.  Finally, we find that Officer McCarrick is entitled to qualified immunity; however, Officer Owens is not.

An appropriate Order follows.